```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Eric S. Jordan,              :

    Plaintiff,           :

  v.                         :        Case No. 2:06-cv-0769

Mark Miller,                 :        JUDGE GRAHAM

    Defendant.           :

REPORT AND RECOMMENDATION

    Plaintiff, Eric Sean Jordan, a state prisoner, filed this action against Mark Miller, the Sheriff of Harrison County, Ohio, asserting a claim under 42 U.S.C. §1983. According to Mr. Jordan's complaint, he was denied medical treatment by Sheriff Miller for almost a year while he was awaiting trial on state charges and while confined at the Jefferson County Jail as a Harrison County detainee. The question raised by the complaint, and by Sheriff Miller's subsequent motion for summary judgment, is whether Sheriff Miller can be held liable to Mr. Jordan for violating Mr. Jordan's right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment. For the following reasons, the Court concludes that he cannot.

I.

    Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464

(1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion. It is with these standards in mind that the instant motion must be decided.

II.

Ordinarily, it is not difficult for the Court to identify those portions of the record which may be considered as setting forth the facts upon which the Court's decision must be rendered. Fed.R.Civ.P. 56(c) authorizes the Court to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which have been submitted in support of or in opposition to the motion. Sheriff Miller's motion for summary judgment is supported by

2

three affidavits, and those clearly may be considered by the Court.  The same is true for the affidavit attached to Mr. Jordan's response.  It is less clear whether the Court may consider the deposition transcript attached to Sheriff Miller's reply memorandum.

The deposition itself appears not to have been taken in this case.  Mr. Jordan has also filed a civil action against Scott Christian, a Harrison County Sheriff's Deputy, claiming excessive use of force.  That case, Jordan v. Christian, has been assigned Case No. 2:06-cv-779.  The deposition transcript attached to Sheriff Miller's reply memorandum bears the caption of that case, although it also bears a different case number (Case No. 2007 CV 697), which does not relate to any case filed by Mr. Jordan in this Court.  Nevertheless, the Court concludes that the deposition was taken in Case No. 2:06-cv-779 based upon the fact that the attorney taking the deposition, Jennifer George, stated at the outset that she represented Scott Christian, "the gentleman that you filed a lawsuit against."  (Tr. 3).  Still, the deposition was neither taken nor directly filed in Jordan v. Miller, the case currently under consideration by the Court.

The fact that the deposition was taken in a different case does not necessarily prevent the Court from considering it in connection with these summary judgment proceedings.  There is case authority supporting the proposition that a deposition taken in a different case may be treated as a sworn statement or affidavit, and that such evidence is admissible in support of or in opposition to summary judgment motions.  See Ary Jewelers v. IDGTC Business Credit Corp., 414 F.Supp. 90 (N. Mass. 2006); see also Burbank v. Davis, 227 F.Supp. 2d 176 (D. Me. 2002).  Mr. Jordan was sworn to tell the truth at his deposition in his other case, and his statements are themselves not hearsay when offered against him by an opposing party.  Fed.R.Evid. 801(d)(2).

Nevertheless, there are authenticity issues created by the fact that the deposition was not taken and filed in this case. Further, the Court is concerned that the deposition transcript itself indicates, at page 157, that Mr. Jordan did not waive signature.  Despite that language, the transcript does not contain his signature, and it contains a certification by the court reporter that the signing of the transcript was waived. These matters create substantial doubt as to whether the Court may consider any of Mr. Jordan's deposition testimony to the extent that it is adverse to his interests in this case.  To the extent that it supports his position, however, because the defendant has submitted the transcript, the Court concludes that any objection to considering a transcript for that purpose has been waived.  With this procedural conundrum resolved, the Court will now proceed to state the facts of the case in the light most favorable to Mr. Jordan.

    Mr. Jordan's complaint provides a fairly bare-bones description of what occurred.  He alleges that on April 25, 2005, as he was being handcuffed by a law enforcement official, his left shoulder was pulled out of its socket.  He saw a doctor that day but the doctor could not provide him with the necessary treatment, which included surgery.  Sheriff Miller then transported (or directed someone else to transport) Mr. Jordan to the Jefferson County Jail because that is where Harrison County inmates are held pending trial.  Mr. Jordan spent the next year in the Jefferson County Jail without ever receiving the recommended surgery.  He alleges that he was in constant pain and that although he took the maximum dosage of pain medication prescribed for him at the jail, it did nothing to help.  He contends that all of his efforts to get further treatment for his shoulder were declined by personnel of the Jefferson County Jail because, according to them, only Sheriff Miller could authorize

medical treatment because of Mr. Jordan's status as a Harrison County detainee.

Sheriff Miller filed three affidavits in support of his summary judgment motion.  The first is an affidavit from Captain Joe Myers, who has held that position with the Harrison County Sheriff's Office since 1997 and who was directly involved in the transportation and care of Mr. Jordan in 2005.  Captain Myers states that Mr. Jordan left Harrison County at 5:30 in the afternoon on April 25, 2005 and arrived for booking at the Jefferson County Jail shortly after 6:00.  The Jefferson County Jail would not admit Mr. Jordan due to his medical condition and he was driven back to the Harrison County Community Hospital Emergency Room.  He stayed there overnight and was examined the next day by Dr. Amin at Trinity Hospital at Jefferson County.  Dr. Amin suggested that Mr. Jordan receive treatment for his shoulder at the Ohio State University Hospital.  However, that hospital refused to accept Mr. Jordan because it treated only prisoners who were confined in the state prison system and Mr. Jordan was still a pretrial detainee.

Over the next few days, Captain Myers explored other ways of obtaining treatment for Mr. Jordan.  He contacted a number of hospitals in the eastern Ohio area, all of which refused to take Mr. Jordan as a patient because he was a prisoner.  He asked Mr. Jordan if he had insurance to pay for medical treatment.  Mr. Jordan said he did not.  After re-contacting Dr. Amin's office, Captain Myers was told that there was no emergency requiring the immediate treatment of Mr. Jordan's shoulder and that the surgery could be postponed for up to ten years.  Finally, Captain Myers noted that Mr. Jordan developed other medical conditions while at the Jefferson County Jail.  Officials at that jail arranged for medical treatment and Harrison County paid for the treatment.  Harrison County ultimately paid in excess of $36,000 in medical

expenses for Mr. Jordan while he was a pretrial detainee.

The next supporting affidavit submitted by Sheriff Miller is from Daniel Rapavi, a corrections officer with the Harrison County Sheriff's Office.  Mr. Rapavi was present when Dr. Amin examined Mr. Jordan's shoulder.  Mr. Rapavi confirmed that Dr. Amin recommended treatment at the Ohio State University Hospital, and he relayed this information to Captain Myers.  Mr. Rapavi also stated that "Dr. Amin informed me that Mr. Jordan's shoulder surgery was not urgent and could be indefinitely postponed." Rapavi Affidavit at ¶ 7.  Mr. Rapavi took Mr. Jordan back to the Jefferson County Jail after Mr. Jordan's shoulder was braced by Dr. Amin's office.

The third affidavit submitted was executed by Wanda Oiler, a registered nurse who works at the Jefferson County Jail.  Ms. Oiler saw Mr. Jordan many times during his incarceration at the jail.  Mr. Jordan did tell jail officials on April 26, 2005 that he needed shoulder surgery.  When she examined him the next day, she did not see any apparent dislocation of his shoulder.  She also personally observed his ability intentionally to dislocate his shoulder.  She began giving him pain medication at that time. She examined him again the next day and, again, his shoulder and arm appeared normal and his circulation was adequate.  She did not believe that he required immediate medical attention.  She also noted that he would remove his sling periodically and that he was able to perform such activities as changing his shirt without difficulty, restriction, or any obvious discomfort.  When Mr. Jordan was later placed on crutches as a result of an ankle injury, he appeared to ambulate well without any restrictions, and he never said that using the crutches caused him to experience shoulder pain.  Her nurse notes and his medical chart reveal no complaints about his left shoulder from May 5, 2005 through March 27, 2006.  He did make several complaints in March

and April, 2006 but she did not believe he needed shoulder treatment.  Finally, Nurse Oiler stated that the Harrison County Sheriff's Office was responsive every time she communicated with them concerning Mr. Jordan's medical needs.

In two responses filed to the summary judgment motion, Mr. Jordan provided the Court with one affidavit and a number of medical records.  The affidavit relates to his ankle injury and is therefore not pertinent to the question of whether he received adequate treatment for his dislocated shoulder.  The medical records are not authenticated, but Sheriff Miller has not objected to them, so the Court will consider their content.

The records essentially confirm the medical treatment which Mr. Jordan received for his shoulder.  He saw Dr. Amin on April 26, 2005.  At that time, Dr. Amin described Mr. Jordan's medical condition as a "very difficult situation" and concluded that a closed reduction would not be sufficient to maintain stability of his shoulder.  Rather, surgical reconstruction of the shoulder capsule and ligaments would be required, and such surgery was beyond Dr. Amin's experience.  He did recommend surgery at either Ohio State University or a hospital in Pittsburgh.  The note did not indicate that Mr. Jordan's shoulder could not be relocated through a closed reduction, but simply that such a relocation would not permanently address the problem.  When Mr. Jordan was taken to the emergency room for his ankle problem on June 17, 2005, he was still complaining of left shoulder pain, although apparently he had experienced a fall which exacerbated the problem.  At that time, he had extremely limited range of motion in the left shoulder but his pulses were normal.  It does not appear that any treatment for the left shoulder was ordered at that time.  Although Mr. Jordan states in his response to the summary judgment motion, as he did in his complaint, that he was in constant pain for the year that he was incarcerated at

Jefferson County, he did not provide his own affidavit in support of that statement.

As noted above, the only other factual submission made in support of the summary judgment motion is the transcript of Mr. Jordan's deposition taken in his other case. Those portions of the deposition which are favorable to Mr. Jordan reveal the following: Dr. Amin did attempt a closed reduction of Mr. Jordan's dislocation, but the shoulder slid back out of its socket after he did so. Dr. Amin put Mr. Jordan's arm in a sling. Mr. Jordan saw Nurse Oiler rarely while he was at the Jefferson County Jail, but she occasionally examined his shoulder because he would be "yelling and complaining it was hurting." (Tr. 104). When she examined his shoulder, she explained that she could not provide treatment because he was waiting for a doctor. Mr. Jordan testified that using crutches hurt his shoulder but it was the only way that he could get around. (Tr. 120). He removed his sling on occasion because sometimes it hurt his shoulder more to be in a sling than if his arm were simply hanging loose. (Tr. 125). Further, he ultimately experienced nerve damage because his shoulder problem was unresolved for so long. (Tr. 132). The summary judgment motion will be decided on the basis of these facts.

### III.

To establish an Eighth Amendment violation, a prisoner must show that he or she has a serious medical condition and that the defendants displayed a deliberate indifference to his or her health. Estelle v. Gamble, 429 U.S. 97 (1976); Wilson v. Seiter, 501 U.S. 294 (1991). This formulation has both a subjective and an objective component. Objectively, the medical condition at issue must be "serious" as opposed to "trivial," "minor," or "insubstantial." Subjectively, the defendants accused of violating the Eighth Amendment must have acted with a state of mind that can accurately described as

"deliberate indifference."  Each of these components requires some elaboration.

It is not always easy to distinguish serious medical conditions from those that are not sufficiently substantial to implicate the Constitutional prohibition against cruel and unusual punishment, and the facts concerning the seriousness of an inmate's condition are frequently in dispute.  In evaluating such claims, courts have given weight to a variety of factors, including whether the condition is one that a doctor or other health care professional would find worthy of treatment, whether it significantly affects everyday activities, and whether it causes (or, if left untreated, has the potential to cause) chronic and substantial pain.  See Chance v. Armstrong, 143 F.3d 688, 702-03 (2d Cir. 1998); see also Harrington v. Grayson, 811 F.Supp. 1221 (E.D. Mich. 1993)(focusing on the severity of the condition, the potential for harm if treatment is delayed, and whether such a delay actually caused additional harm).

Under some circumstances, expert testimony may be needed to establish the seriousness of a medical condition, particularly if the inmate's claim is founded upon an unreasonable delay in treatment.  See Napier v. Madison Co., Ky., 238 F.3d 739 (6th Cir. 2201).  In other cases, however, when the condition does not involve "minor maladies or non-obvious complaints of a serious need for medical care," but rather "an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers," expert testimony is not essential to a finding that a serious medical condition is present.  Blackmore v. Kalamazoo County, 390 F.3d 890, 898 (6th Cir. 2004).

As to the subjective element, in Farmer v. Brennan, 511 U.S. 825, 839 (1994), the Court adopted "subjective recklessness as used in the criminal law" as the appropriate definition for deliberate indifference. It held that "a prison official cannot be held liable under the Eighth Amendment for denying an inmate

humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. . . ." Id. at 837.  Officials must be aware of facts from which they could conclude that a substantial risk exists and must actually draw that conclusion.  Id.  Prison officials who know of a substantial risk to the health or safety of an inmate are free from liability if "they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Because an Eighth Amendment medical claim must be premised on deliberate indifference, mere negligence by a prison doctor or prison official with respect to medical diagnosis or treatment is not actionable under 42 U.S.C. §1983.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Brooks v. Celeste, 39 F.3d 125 (6th Cir. 1994).

Defendant Miller first argues that Mr. Jordan's shoulder condition was not a "serious medical condition" so that the Eighth Amendment does not apply here.  However, a medical condition which ultimately requires surgery and which causes significant pain can qualify as a "serious medical condition" under Eighth Amendment analysis.  Certainly, a dislocated shoulder is usually deemed worthy of a doctor's care, and it can interfere with the performance of everyday activities.  In a similar case involving delay in treatment for a dislocated shoulder ultimately resulting in permanent damage to the shoulder joint, a serious medical need was found to exist.  See Petrichko v. Kurtz, 52 F.Supp. 2d 503 (E.D. Pa. 1999).  There is, at a minimum, a genuine factual dispute about the seriousness of Mr. Jordan's dislocated shoulder.  Consequently, the Court turns to the other relevant inquiry, which is whether a reasonable trier

10

of fact could conclude that Sheriff Miller was deliberately indifferent to this medical condition.

In the Court's view, the key fact in this case is the statement made by Dr. Amin, and ultimately relayed to either Sheriff Miller or his subordinates, that Mr. Jordan could wait for his shoulder surgery.  There is no dispute that, soon after the injury occurred, Harrison County Deputies sought medical treatment on Mr. Jordan's behalf.  Although they did not do so immediately after the injury occurred, as soon as Jefferson County refused to book him into the jail, he was taken to two different medical facilities for treatment.  Harrison County officials pursued a surgical option after being advised by Dr. Amin that neither he nor anyone outside of a hospital setting could give Mr. Jordan any further useful treatment.  Although the reasons that those efforts were not originally successful are unrelated to whether Mr. Jordan needed shoulder surgery, it is not disputed that after making those unsuccessful attempts, and after contacting Dr. Amin for further suggestions, Harrison County officials were told that Mr. Jordan's surgery could wait.

This piece of information completely negates any inference that Harrison County officials had the requisite subjective intent simply to cause Mr. Jordan to suffer unneeded pain. Significantly, there is no evidence that they were ever told that the delay in surgery, although it might ultimately not impact the outcome of the surgical procedure, would cause Mr. Jordan to experience unmanageable pain while he waited for surgery, or that the delay would cause nerve damage or some other irreparable problem.  Certainly, the delay was not life-threatening.  Without being specifically advised that the delay, although not life-threatening or limb-threatening, would cause Mr. Jordan to suffer unnecessarily, Harrison County officials could not have formed the requisite subjective intent required under Farmer v. Brennan, supra.  Consequently, the Court holds that a reasonable trier of fact could not find an Eighth Amendment violation.  This finding

11

eliminates the need to determine whether Sheriff Miller could be held liable in this case in his individual capacity or whether, if the suit were considered to be an official capacity suit, Harrison County could be held liable for the actions or inactions of Sheriff Miller or his subordinates.

IV.

Based upon the foregoing, it is recommended that the defendant's motion for summary judgment (#12) be granted and that judgment be entered in this case against Plaintiff Eric Jordan.

PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge